**EXHIBIT E**

Private Client Group

**Merrill Lynch Business
Financial Services Inc.**
222 N. LaSalle
17th Floor
Chicago, Illinois 60601
Tel: 312-269-4461
Fax: 312-499-3252
William_sardegna@ml.com

Bill Sardegna
Assistant Vice President

March 24, 2006

# **Merrill Lynch**

<u>**VIA UPS FIRST CLASS MAIL AND OVERNIGHT COURIER**</u>

D.M.S. Diamond Co., Inc.
10 West 47th Street
New York, NY 10036

Attention: Mr. Marc Steinberg

### NOTICE OF DEFAULT AND DEMAND FOR PAYMENT

Ladies and Gentlemen:

This letter refers to:

This letter refers to certain agreements between Merrill Lynch Business Financial Services Inc. ("MLBFS"), D.M. S. Diamond Co., Inc. ("Customer"), and Marc Steinberg ("Steinberg") with respect to:

(i) a certain **WCMA NOTE, LOAN AND SECURITY AGREEMENT NO. 885-07794** dated as of November 24, 1997 between MLBFS and Customer, as thereafter supplemented, renewed, extended and/or amended (the "Loan Agreement");

(ii) a certain **UNCONDITIONAL GUARANTY** dated as of January 30, 2001, given to MLBFS by Steinberg (the "Guaranty");

(iii) all other agreements between MLBFS and Customer or Steinberg, or any other party who at any time has guaranteed or provided collateral, or will hereinafter guarantee or provide collateral (a "Guarantor", or, if plural, "Guarantors") for Customer's obligations to MLBFS in connection therewith (the "Additional Agreements");

For purposes of this letter, (i) the Loan Agreement, Guaranty and Additional Agreements will collectively be referred to as the "Loan Documents", and (ii) Customer, Steinberg and Guarantors will collectively be referred to as the "Obligors". Capitalized terms used herein and not defined herein shall have the meaning set forth in the Loan Documents.

MLBFS sent Obligors a "Notice of Non-Renewal and Maturity Date Events" dated February 15, 2006, that among other things, indicated that the Line of Credit would be terminated and all Obligations would be due on February 28, 2006. Obligors failed to fully repay the Obligations by February 28, 2006 and an Event of Default has occurred and is continuing under the Loan Documents.

**MLBFS hereby makes demand upon Obligors to immediately provide the following information.**

- 2/28/06 or more current A/R Aging with invoice detail
- 2/28/06 or more current A/P Aging
- 2/28/06 or more current inventory listing with consignment detail
- Copies of Sterling National Bank Loan Documents

As of the close of business March 24, 2006, $393,108.92 is outstanding under the Loan Documents, consisting of $391,070.35 of principal and $2,038.57 in accrued interest.  Additional interest and other charges under the Loan Documents will continue to accrue on and after the date of this letter, thereby increasing the Obligations owed.

**Demand is hereby made upon Obligors, and each of them, to fully repay the Obligations by 5PM CST on March 31, 2006.  If MLBFS does not receive a full payoff on or before March 31, 2006, a late charge in the amount of 5% of all outstanding Obligations will be charged to the account.**

Please be advised that notwithstanding anything contained in this letter, this letter (i) does not in any manner constitute any waiver of either (a) any of our rights, remedies or powers pursuant to the Loan Documents or any other agreement, document, or instrument or applicable law or (b) any Event of Default (howsoever defined) under the Loan Documents; and (ii) is not to be construed as an agreement by us to allow any cure periods at a later date not specifically provided for in the Loan Documents or any other applicable agreement, document or instrument.

I trust that you will give this matter your foremost attention.

Sincerely,

Bill Sardegna
Assistant Vice President


cc:     Marc Steinberg
        2467 Logue Street
        N. Bellmore, NY 11710
        (Via Overnight Courier)

        Stephan E. Rothe
        (Via Electronic Mail)

        Jonathan Kenyon
        (Via Electronic Mail)

# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTERN DISTRICT OF NEW YORK

JUDGE PRESKA

-------------------------------------------------------------------x

MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.,

07 CV _CV_ 7048

                              Plaintiff,               :

               -against-                              :          **COMPLAINT**

D.M.S. DIAMOND CO., INC., MARC STEINBERG, and     :
"JOHN DOE #1" THROUGH "JOHN DOE #12", the last     :
twelve names being fictitious and unknown to plaintiff,  :
being persons having or claiming an interest in or lien   :
upon the Collateral described in the complaint,          :



                              Defendants.              :

-------------------------------------------------------------------x

        Plaintiff, Merrill Lynch Business Financial Services Inc., by its attorney, Spencer L. Schnei-

der, complains of defendants as follows:

<u>Parties</u>

        1.  Merrill Lynch Business Financial Services Inc. ("MLBFS") is incorporated under the

laws of the State of Delaware with its principal place of business at 222 North LaSalle Street, Chi-

cago, IL 60601.

        2.  Upon information and belief, defendant D.M.S. Diamond Co., Inc., ("DMS") is a New

York corporation and has its principal place of business at 10 West 47th Street, New York, NY

10036.

        3.  Upon information and belief, defendant Marc Steinberg ("Steinberg") is domiciled at

2467 Logue Street, N. Bellmore, NY 11710.

        4.  Upon information and belief, defendants "John Doe #1" through "John Doe #12" are fic-

titious and unknown to plaintiff, being persons having or claiming an interest in or lien upon the col-

lateral described hereinafter.

Jurisdiction and Venue

5.  Subject matter jurisdiction exists under 28 USC §1332 because there is complete diversity and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6.  Venue exists under 28 USC §1391 because defendant DMS resides in this judicial district.

Claim

7.  On November 24, 1997, defendant DMS and plaintiff entered into a WCMA Loan and Security Agreement ("WCMA Note"), and plaintiff granted DMS a $300,000 line of credit.

8.  A copy of the WCMA Note is attached as Exhibit A hereto.

9.  Under the WCMA Note, DMS promised to repay to plaintiff all unpaid amounts of all monies lent by plaintiff to it, including interest, attorneys' fees and any late fees, and it waived presentment, demand for payment, protest, notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and formalities.

10. In order to induce plaintiff to enter into the WCMA Note, on November 24, 1997, defendant Steinberg gave plaintiff his absolute and unconditional guaranty ("Guaranty") of DMS's indebtedness and promised to repay the entire indebtedness to plaintiff upon a default of the WCMA Note. At all relevant times, defendant Steinberg was a principal of DMS.

11. A copy of the Guaranty is attached as Exhibit B hereto.

12. As further inducement to plaintiff for issuing the line of credit, DMS granted plaintiff perfected security interests in all of its accounts, chattel paper, inventory, equipment, deposit accounts, financial assets and the proceeds thereof (the "Collateral").

13. The line of credit initially expired on November 30, 1998, but was extended annually

2

subject to annual renewals conditioned upon DMS's satisfactory credit condition.

14. Under the WCMA Note, DMS promised, among other things, to furnish plaintiff with certain financial information to enable plaintiff to determine its credit condition.

15. Despite demand, defendant failed to provide this information.

16. Due to defendant's failure to provide the requisite financial information due under the WCMA Note, plaintiff determined not to renew the line of credit and it expired on February 28, 2006.

17. On March 24, 2006, plaintiff sent defendants a notice of default and demand for repayment, reminding defendants of the expiration of the line of credit and demanding repayment of indebtedness, which was now outstanding and due as a result of its expiration.

18. Defendants failed to comply with plaintiff's demand, thereby breaching the WCMA Note and the Guaranty.

19. As of August 6, 2007, the indebtedness owed to plaintiff under the WCMA Note and Guaranty is $328,669.92, which includes interest due under the loan agreement through such date, exclusive of further accrued interest, attorneys' fees, and other fees due under these agreements.

FIRST CAUSE OF ACTION

20. The allegations of paragraphs 1 through 19 above are incorporated herein as if set forth in full.

21. The indebtedness owed and guaranteed by the defendants is outstanding and due.

22. Defendants breached the WCMA Note and Guaranty by failing to timely repay the indebtedness.

23. Plaintiff has been damaged as a result of defendants' breaches in the amount of $328,669.92, plus additional interest, attorneys' fees and costs.

3

## SECOND CAUSE OF ACTION

24.  The allegations of paragraphs 1 through 23 above are incorporated herein as if set forth in full.

25.  At all relevant times, plaintiff has been entitled to possession of the Collateral by virtue of the breach of the WCMA Note and the perfected security interests.

26.  Defendants have wrongfully withheld the Collateral from the possession of the plaintiff.

27.  Plaintiff has been damaged and is entitled to possession of the Collateral.

## Demand for Relief

WHEREFORE, plaintiff demands, against defendants, damages in the amount of $328,669.92, plus additional interest and attorneys' fees accrued in collecting the debt, plus possession of the Collateral.

Dated:  New York, New York
       August 6, 2007

SPENCER L. SCHNEIDER (SS-2471)

Attorney for Plaintiff
70 Lafayette Street, 7th Floor
New York, NY 10013
Tel: (212) 233-7400
Fax: (212) 233-9713
sschneider@slsatty.com

4

# EXHIBIT A

**Merrill Lynch**

No. 885-0779

# WCMA® NOTE, LOAN AND SECURITY AGREEMENT

**WCMA NOTE, LOAN AND SECURITY AGREEMENT** ("Loan Agreement") dated as of November 24, 199? between D.M.S. DIAMOND CO., INC., a corporation organized and existing under the laws of the State of New York having its principal office at 10 West 47th Street, New York, NY 10036 ("Customer"), and **MERRILL LYNCH BUSINESS FINANCIAL SERVICES INC.**, a corporation organized and existing under the laws of the State of Delaware having its principal office at 33 West Monroe Street, Chicago, IL 6060 ("MLBFS").

In accordance with that certain **WORKING CAPITAL MANAGEMENT® ACCOUNT AGREEMENT NO. 885** 07794 ("WCMA Agreement") between Customer and MLBFS' affiliate, **MERRILL LYNCH, PIERCE FENNER & SMITH INCORPORATED** ("MLPF&S"), Customer has subscribed to the WCMA Program described in the WCMA Agreement. The WCMA Agreement is by this reference incorporated as a part hereof. In conjunction therewith and as part of the WCMA Program, Customer has requested that MLBFS provide, and subject to the terms and conditions herein set forth MLBFS has agreed to provide, a commercial line of credit for Customer (the "WCMA Line of Credit").

Accordingly, and in consideration of the premises and of the mutual covenants of the parties hereto Customer and MLBFS hereby agree as follows:

## 1. DEFINITIONS

(a) **Specific Terms.** In addition to terms defined elsewhere in this Loan Agreement, when used herein the following terms shall have the following meanings:

(i) "Account Debtor" shall mean any party who is or may become obligated with respect to an Account o Chattel Paper.

(ii) "Activation Date" shall mean the date upon which MLBFS shall cause the WCMA Line of Credit to be fully activated under MLPF&S' computer system as part of the WCMA Program.

(iii) "Additional Agreements" shall mean all agreements, instruments, documents and opinions other than this Loan Agreement, whether with or from Customer or any other party, which are contemplated hereby or otherwise reasonably required by MLBFS in connection herewith, or which evidence the creation, guaranty or collateralization of any of the Obligations or the granting or perfection of liens or security interests upon the Collateral or any other collateral for the Obligations.

(iv) "Bankruptcy Event" shall mean any of the following: (A) a proceeding under any bankruptcy, reorganization, arrangement, insolvency, readjustment of debt or receivership law or statute shall be filed or consented to by Customer or any Guarantor; or (B) any such proceeding shall be filed against Customer or any Guarantor and shall not be dismissed or withdrawn within sixty (60) days after filing; or (C) Customer or any Guarantor shall make a general assignment for the benefit of creditors; or (D) Customer or any Guarantor shall become insolvent or generally fail to pay or admit in writing its inability to pay its debts as they become due; or (E) Customer or any Guarantor shall be adjudicated a bankrupt or insolvent.

(v) "Business Day" shall mean any day other than a Saturday, Sunday, federal holiday or other day on which the New York Stock Exchange is regularly closed.

(vi) "Collateral" shall mean all Accounts, Chattel Paper, Contract Rights, Inventory, Equipment, Fixtures, General Intangibles, Deposit Accounts, Documents and Instruments of Customer, howsoever arising, whether now owned or existing or hereafter acquired or arising, and wherever located; together with all parts



thereof (including spare parts), all accessories and accessions thereto, all books and records (including computer records) directly related thereto, all proceeds thereof (including, without limitation, proceeds in the form of Accounts and insurance proceeds), and the additional collateral described in Section 9 (b) hereof.

(vii) "Commitment Expiration Date" shall mean December 24, 1997.

(viii) "General Funding Conditions" shall mean each of the following conditions to any WCMA Loan by MLBFS hereunder: (A) no Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default, shall have occurred and be continuing or would result from the making of any WCMA Loan hereunder by MLBFS; (B) there shall not have occurred and be continuing any material adverse change in the business or financial condition of Customer or any Guarantor; (C) all representations and warranties of Customer or any Guarantor herein or in any Additional Agreements shall then be true and correct in all material respects; (D) MLBFS shall have received this Loan Agreement and all of the Additional Agreements, duly executed and filed or recorded where applicable, all of which shall be in form and substance reasonably satisfactory to MLBFS; (E) MLBFS shall have received evidence reasonably satisfactory to it as to the ownership of the Collateral and the perfection and priority of MLBFS' liens and security interests thereon, as well as the ownership of and the perfection and priority of MLBFS' liens and security interests on any other collateral for the Obligations furnished pursuant to any of the Additional Agreements; (F) MLBFS shall have received evidence reasonably satisfactory to it of the insurance required hereby or by any of the Additional Agreements; and (G) any additional conditions specified in the "WCMA Line of Credit Approval" letter executed by MLBFS with respect to the transactions contemplated hereby shall have been met to the reasonable satisfaction of MLBFS.

(ix) "Guarantor" shall mean a person or entity who has either guaranteed or provided collateral for any or all of the Obligations.

(x) "Interest Rate" shall mean a variable per annum rate of interest equal to the sum of 3.40% and the 30-Day Commercial Paper Rate. The "30-Day Commercial Paper Rate" shall mean, as of the date of any determination, the interest rate from time to time published in the "Money Rates" section of *The Wall Street Journal* for 30-day high-grade unsecured notes sold through dealers by major corporations. The Interest Rate will change as of the date of publication in *The Wall Street Journal* of a 30-Day Commercial Paper Rate that is different from that published on the preceding Business Day. In the event that *The Wall Street Journal* shall, for any reason, fail or cease to publish the 30-Day Commercial Paper Rate, MLBFS will choose a reasonably comparable index or source to use as the basis for the Interest Rate.

(xi) "Line Fee" shall mean a fee of $3,000.00 payable to MLBFS in connection with the WCMA Line of Credit for the period from the Activation Date to the Maturity Date.

(xii) "Location of Tangible Collateral" shall mean the address of Customer set forth at the beginning of this Loan Agreement, together with any other address or addresses set forth on an exhibit hereto as being a Location of Tangible Collateral.

(xiii) "Maturity Date" shall mean November 30, 1998, or such later date as may be consented to in writing by MLBFS.

(xiv) "Maximum WCMA Line of Credit" shall mean $300,000.00.

(xv) "Obligations" shall mean all liabilities, indebtedness and other obligations of Customer to MLBFS, howsoever created, arising or evidenced, whether now existing or hereafter arising, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary or joint or several, and, without limiting the foregoing, shall include interest accruing after the filing of any petition in bankruptcy, and all present and future liabilities, indebtedness and obligations of Customer under this Loan Agreement.

(xvi) "Permitted Liens" shall mean (A) liens for current taxes not delinquent, other non-consensual liens arising in the ordinary course of business for sums not due, and, if MLBFS' rights to and interest in the Collateral are not materially and adversely affected thereby, any such liens for taxes or other non-

-2-




consensual liens arising in the ordinary course of business being contested in good faith by appropriat proceedings; (B) liens in favor of MLBFS; (C) liens which will be discharged with the proceeds of the Initia WCMA Loan; and (D) any other liens expressly permitted in writing by MLBFS.

(xvii) "WCMA Account" shall mean and refer to the Working Capital Management Account of Customer wit MLPF&S identified as Account No. 885-07794.

(xviii) "WCMA Loan" shall mean each advance made by MLBFS pursuant to this Loan Agreement.

(b) **Other Terms.** Except as otherwise defined herein: (i) all terms used in this Loan Agreement which ar defined in the Uniform Commercial Code of Illinois ("UCC") shall have the meanings set forth in the UCC and (ii) capitalized terms used herein which are defined in the WCMA Agreement shall have the meaning set forth in the WCMA Agreement.

## 2. WCMA PROMISSORY NOTE

FOR VALUE RECEIVED, Customer hereby promises to pay to the order of MLBFS, at the times and in the manner set forth in this Loan Agreement, or in such other manner and at such place as MLBFS may hereafter designate in writing, the following: (a) on the Maturity Date, the aggregate unpaid principal amoun of all WCMA Loans (the "WCMA Loan Balance"); (b) interest at the Interest Rate on the outstanding WCMA Loan Balance, from and including the date on which the initial WCMA Loan is made until the date o payment of all WCMA Loans in full; and (c) on demand, all other sums payable pursuant to this Loan Agreement, including, but not limited to, the Line Fee and any late charges. Except as otherwise expressly set forth herein, Customer hereby waives presentment, demand for payment, protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate and all other notices and formalities in connection with this WCMA Promissory Note and this Loan Agreement.

## 3. WCMA LOANS

(a) **Activation Date.** Provided that: (i) the Commitment Expiration Date shall not then have occurred, and (ii) Customer shall have subscribed to the WCMA Program and its subscription to the WCMA Program shall then be in effect, the Activation Date shall occur on or promptly after the date, following the acceptance of this Loan Agreement by MLBFS at its office in Chicago, Illinois, upon which each of the General Funding Conditions shall have been met or satisfied to the reasonable satisfaction of MLBFS. No activation by MLBFS of the WCMA Line of Credit for a nominal amount shall be deemed evidence of the satisfaction of any of the conditions herein set forth, or a waiver of any of the terms or conditions hereof. Customer hereby authorizes MLBFS to pay out of and charge to Customer's WCMA Account on the Activation Date any and all amounts necessary to fully pay off any bank or other financial institution having a lien upon any of the Collateral other than a Permitted Lien.

(b) **WCMA Loans.** Subject to the terms and conditions hereof, during the period from and after the Activation Date to the Maturity Date: (i) MLBFS will make WCMA Loans to Customer in such amounts as Customer may from time to time request in accordance with the terms hereof, up to an aggregate outstanding amount not to exceed the Maximum WCMA Line of Credit, and (ii) Customer may repay any WCMA Loans in whole or in part at any time without premium or penalty, and request a re-borrowing of amounts repaid on a revolving basis. Customer may request WCMA Loans by use of WCMA Checks, FTS, Visa® charges, wire transfers, or such other means of access to the WCMA Line of Credit as may be permitted by MLBFS from time to time; it being understood that so long as the WCMA Line of Credit shall be in effect, any charge or debit to the WCMA Account which but for the WCMA Line of Credit would under the terms of the WCMA Agreement result in an overdraft, shall be deemed a request by Customer for a WCMA Loan.

(c) **Conditions of WCMA Loans.** Notwithstanding the foregoing, MLBFS shall not be obligated to make any WCMA Loan, and may without notice refuse to honor any such request by Customer, if at the time of receipt by MLBFS of Customer's request: (i) the making of such WCMA Loan would cause the Maximum WCMA Line of Credit to be exceeded; or (ii) the Maturity Date shall have occurred, or the WCMA Line of Credit

shall have otherwise been terminated in accordance with the terms hereof; or (iii) Customer's subscription to the WCMA Program shall have been terminated; or (iv) an event shall have occurred and is continuing which shall have caused any of the General Funding Conditions to not then be met or satisfied to the reasonable satisfaction of MLBFS. The making by MLBFS of any WCMA Loan at a time when any one or more of said conditions shall not have been met shall not in any event be construed as a waiver of said condition or conditions or of any Event of Default, and shall not prevent MLBFS at any time thereafter while any condition shall not have been met from refusing to honor any request by Customer for a WCMA Loan.

(d) **Force Majeure.** MLBFS shall not be responsible, and shall have no liability to Customer or any other party, for any delay or failure of MLBFS to honor any request of Customer for a WCMA Loan or any other act or omission of MLBFS, MLPF&S or any of their affiliates due to or resulting from any system failure, error or delay in posting or other clerical error, loss of power, fire, Act of God or other cause beyond the reasonable control of MLBFS, MLPF&S or any of their affiliates unless directly arising out of the willful wrongful act or active gross negligence of MLBFS. In no event shall MLBFS be liable to Customer or any other party for any incidental or consequential damages arising from any act or omission by MLBFS, MLPF&S or any of their affiliates in connection with the WCMA Line of Credit or this Loan Agreement.

(e) **Interest.** The WCMA Loan Balance shall bear interest at the Interest Rate. Interest shall be computed for the actual number of days elapsed on the basis of a year consisting of 360 days. Notwithstanding any provision to the contrary in this Agreement or any of the Additional Agreements, no provision of this Agreement or any of the Additional Agreements shall require the payment or permit the collection of any amount in excess of the maximum amount of interest permitted to be charged by law ("Excess Interest"). If any Excess Interest is provided for, or is adjudicated as being provided for, in this Agreement or any of the Additional Agreements, then: (a) Customer shall not be obligated to pay any Excess Interest; and (b) any Excess Interest that MLBFS may have received hereunder or under any of the Additional Agreements shall, at the option of MLBFS, be: (i) applied as a credit against the then unpaid balance of the WCMA Line of Credit, (ii) refunded to the payer thereof, or (iii) any combination of the foregoing. Except as otherwise provided herein, accrued and unpaid interest on the WCMA Loan Balance shall be payable monthly on the last Business Day of each calendar month, commencing with the last Business Day of the calendar month in which the Activation Date shall occur. Customer hereby irrevocably authorizes and directs MLPF&S to pay MLBFS such accrued interest from any available free credit balances in the WCMA Account, and if such available free credit balances are insufficient to satisfy any interest payment due, to liquidate any investments in the Money Accounts (other than any investments constituting any Minimum Money Accounts Balance under the WCMA Directed Reserve program) in an amount up to the balance of such accrued interest, and pay to MLBFS the available proceeds on account thereof. If available free credit balances in the WCMA Account and available proceeds of the Money Accounts are insufficient to pay the entire balance of accrued interest, and Customer otherwise fails to make such payment when due, MLBFS may, in its sole discretion, make a WCMA Loan in an amount equal to the balance of such accrued interest and pay the proceeds of such WCMA Loan to itself on account of such interest. The amount of any such WCMA Loan will be added to the WCMA Loan Balance. If MLBFS declines to extend a WCMA Loan to Customer under these circumstances, Customer hereby authorizes and directs MLPF&S to make all such interest payments to MLBFS from any Minimum Money Accounts Balance. If there is no Minimum Money Accounts Balance, or it is insufficient to pay all such interest, MLBFS will invoice Customer for payment of the balance of the accrued interest, and Customer shall pay such interest as directed by MLBFS within 5 Business Days of receipt of such invoice.

(f) **Payments.** All payments required or permitted to be made pursuant to this Loan Agreement shall be made in lawful money of the United States. Unless otherwise directed by MLBFS, payments on account of the WCMA Loan Balance may be made by the delivery of checks (other than WCMA Checks), or by means of FTS or wire transfer of funds (other than funds from the WCMA Line of Credit) to MLPF&S for credit to Customer's WCMA Account. Notwithstanding anything in the WCMA Agreement to the contrary, Customer hereby irrevocably authorizes and directs MLPF&S to apply available free credit balances in the WCMA Account to the repayment of the WCMA Loan Balance prior to application for any other purpose. Payments to MLBFS from funds in the WCMA Account shall be deemed to be made by Customer upon the same basis and schedule as funds are made available for investment in the Money Accounts in accordance with the terms of the WCMA Agreement. All funds received by MLBFS from MLPF&S pursuant to the aforesaid authorization shall be applied by MLBFS to repayment of the WCMA Loan Balance. The acceptance by or on behalf of MLBFS of a check or other payment for a lesser amount than shall be due from Customer,

 

regardless of any endorsement or statement thereon or transmitted therewith, shall not be deemed a accord and satisfaction or anything other than a payment on account, and MLBFS or anyone acting o behalf of MLBFS may accept such check or other payment without prejudice to the rights of MLBFS t recover the balance actually due or to pursue any other remedy under this Loan Agreement or applicabl law for such balance. All checks accepted by or on behalf of MLBFS in connection with the WCMA Line o Credit are subject to final collection.

(g) **Exceeding the Maximum WCMA Line of Credit.** In the event that the WCMA Loan Balance shall a any time exceed the Maximum WCMA Line of Credit, Customer shall within 1 Business Day of the first t occur of (i) any request or demand of MLBFS, or (ii) receipt by Customer of a statement from MLPF&S showing a WCMA Loan Balance in excess of the Maximum WCMA Line of Credit, deposit sufficient fund into the WCMA Account to reduce the WCMA Loan Balance below the Maximum WCMA Line of Credit.

(h) **Line Fee; Extensions.** (i) In consideration of the extension of the WCMA Line of Credit by MLBFS t Customer during the period from the Activation Date to the Maturity Date, Customer has paid or shall pa the Line Fee to MLBFS. If such fee has not heretofore been paid by Customer, Customer hereby authorizes MLBFS, at its option, to either cause said fee to be paid with a WCMA Loan which is added to the WCMA Loan Balance, or invoice Customer for said fee (in which event Customer shall pay said fee within ! Business Days after receipt of such invoice). No delay in the Activation Date, howsoever caused, shal entitle Customer to any rebate or reduction in the Line Fee or extension of the Maturity Date.

(ii) In the event MLBFS and Customer, in their respective sole discretion, agree to renew the WCMA Line o Credit beyond the current Maturity Date, Customer agrees to pay a renewal Line Fee or Line Fees (if the Maturity Date is extended for more than one 12-month period), in the amount per 12-month period or othe applicable period then set forth in the writing signed by MLBFS which extends the Maturity Date; it being understood that any request by Customer for a WCMA Loan or failure of Customer to pay any WCMA Loan Balance outstanding on the immediately prior Maturity Date, after the receipt by Customer of a writing signed by MLBFS extending the Maturity Date, shall be deemed a consent by Customer to both the renewal Line Fees and the new Maturity Date. If no renewal Line Fees are set forth in the writing signed by MLBFS extending the Maturity Date, the renewal Line Fee for each 12-month period shall be deemed to be the same as the immediately preceding periodic Line Fee. Each such renewal Line Fee may, at the option of MLBFS, either be paid with a WCMA Loan which is added to the WCMA Loan Balance or invoiced to Customer, as aforesaid, on or at any time after the first Business Day of the first month of the 12-month period for which such fee is due.

(i) **Statements.** MLPF&S will include in each monthly statement it issues under the WCMA Program information with respect to WCMA Loans and the WCMA Loan Balance. Any questions that Customer may have with respect to such information should be directed to MLBFS; and any questions with respect to any other matter in such statements or about or affecting the WCMA Program should be directed to MLPF&S.

(j) **Use of Loan Proceeds; Securities Transactions.** The proceeds of each WCMA Loan shall be used by Customer solely for working capital in the ordinary course of its business, or, with the prior written consent of MLBFS, for other lawful business purposes of Customer not prohibited hereby. **Customer agrees that under no circumstances will funds borrowed from MLBFS through the WCMA Line of Credit be used: (i) for personal, family or household purposes of any person whatsoever, or (ii) to purchase, carry or trade in securities, or repay debt incurred to purchase, carry or trade in securities, whether in or in connection with the WCMA Account, another account of Customer with MLPF&S or an account of Customer at any other broker or dealer in securities.**

## 4. REPRESENTATIONS AND WARRANTIES

Customer represents and warrants to MLBFS that:

(a) **Organization and Existence.** Customer is a corporation, duly organized and validly existing in good standing under the laws of the State of New York and is qualified to do business and in good standing in each other state where the nature of its business or the property owned by it make such qualification necessary.

(b) **Execution, Delivery and Performance.** The execution, delivery and performance by Customer of th Loan Agreement and by Customer and each Guarantor of such of the Additional Agreements to which it is party: (i) have been duly authorized by all requisite action, (ii) do not and will not violate or conflict with ar law or other governmental requirement, or any of the agreements, instruments or documents which forme or govern Customer or any such Guarantor, and (iii) do not and will not breach or violate any of th provisions of, and will not result in a default by Customer or any such Guarantor under, any othe agreement, instrument or document to which it is a party or by which it or its properties are bound.

(c) **Notices and Approvals.** Except as may have been given or obtained, no notice to or consent c approval of any governmental body or authority or other third party whatsoever (including, without limitatior any other creditor) is required in connection with the execution, delivery or performance by Customer or an Guarantor of such of this Loan Agreement and the Additional Agreements to which it is a party.

(d) **Enforceability.** This Loan Agreement and such of the Additional Agreements to which Customer or an Guarantor is a party are the respective legal, valid and binding obligations of Customer and such Guarantor enforceable against it or them, as the case may be, in accordance with their respective terms, except as enforceability may be limited by bankruptcy and other similar laws affecting the rights of creditors generally or by general principles of equity.

(e) **Collateral.** Except for any Permitted Liens: (i) Customer has good and marketable title to the Collateral (ii) none of the Collateral is subject to any lien, encumbrance or security interest, and (iii) upon the filing o all Uniform Commercial Code financing statements executed by Customer with respect to the Collateral in the appropriate jurisdiction(s) and/or the completion of any other action required by applicable law to perfect its liens and security interests, MLBFS will have valid and perfected first liens and security interests upon all of the Collateral.

(f) **Financial Statements.** Except as expressly set forth in Customer's financial statements, all financial statements of Customer furnished to MLBFS have been prepared in conformity with generally accepted accounting principles, consistently applied, are true and correct, and fairly present the financial condition of it as at such dates and the results of its operations for the periods then ended; and since the most recent date covered by such financial statements, there has been no material adverse change in any such financial condition or operation. All financial statements furnished to MLBFS of any Guarantor are true and correct and fairly represent such Guarantor's financial condition as of the date of such financial statements, and since the most recent date of such financial statements, there has been no material adverse change in such financial condition.

(g) **Litigation.** No litigation, arbitration, administrative or governmental proceedings are pending or, to the knowledge of Customer, threatened against Customer or any Guarantor, which would, if adversely determined, materially and adversely affect the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any such Guarantor or the continued operations of Customer.

(h) **Tax Returns.** All federal, state and local tax returns, reports and statements required to be filed by Customer and each Guarantor have been filed with the appropriate governmental agencies and all taxes due and payable by Customer and each Guarantor have been timely paid (except to the extent that any such failure to file or pay will not materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer).

(i) **Collateral Location.** All of the tangible Collateral is located at a Location of Tangible Collateral.

Each of the foregoing representations and warranties: (i) has been and will be relied upon as an inducement to MLBFS to provide the WCMA Line of Credit, and (ii) is continuing and shall be deemed remade by Customer concurrently with each request for a WCMA Loan.



## 5. FINANCIAL AND OTHER INFORMATION

Customer shall furnish or cause to be furnished to MLBFS during the term of this Loan Agreement all of th following:

(a) **Annual Financial Statements.** Within 120 days after the close of each fiscal year of Custome, Customer shall furnish or cause to be furnished to MLBFS a copy of the annual reviewed financia statements of Customer, consisting of at least a balance sheet as at the close of such fiscal year and relate statements of income, retained earnings and cash flows, reviewed by its current independent accountants o other independent accountants reasonably acceptable to MLBFS and certified by its chief financial officer.

(b) **Other Information.** Customer shall furnish or cause to be furnished to MLBFS such other informatio as MLBFS may from time to time reasonably request relating to Customer, any Guarantor or the Collateral.

## 6. OTHER COVENANTS

Customer further agrees during the term of this Loan Agreement that:

(a) **Financial Records; Inspection.** Customer will: (i) maintain at its principal place of business complete and accurate books and records, and maintain all of its financial records in a manner consistent with the financial statements heretofore furnished to MLBFS, or prepared on such other basis as may be approved in writing by MLBFS; and (ii) permit MLBFS or its duly authorized representatives, upon reasonable notice and at reasonable times, to inspect its properties (both real and personal), operations, books and records.

(b) **Taxes.** Customer and each Guarantor will pay when due all taxes, assessments and other governmental charges, howsoever designated, and all other liabilities and obligations, except to the extent that any such failure to pay will not materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor or the continued operations of Customer.

(c) **Compliance With Laws and Agreements.** Neither Customer nor any Guarantor will violate any law, regulation or other governmental requirement, any judgment or order of any court or governmental agency or authority, or any agreement, instrument or document to which it is a party or by which it is bound, if any such violation will materially and adversely affect either the liens and security interests of MLBFS hereunder or under any of the Additional Agreements, the financial condition of Customer or any Guarantor, or the continued operations of Customer.

(d) **Notification By Customer.** Customer shall provide MLBFS with prompt written notification of: (i) any Event of Default, or event which with the giving of notice, passage of time, or both, would constitute an Event of Default; (ii) any materially adverse change in the business, financial condition or operations of Customer; and (iii) any information which indicates that any financial statements of Customer or any Guarantor fail in any material respect to present fairly the financial condition and results of operations purported to be presented in such statements. Each notification by Customer pursuant hereto shall specify the event or information causing such notification, and, to the extent applicable, shall specify the steps being taken to rectify or remedy such event or information.

(e) **Notice of Change.** Customer shall give MLBFS not less than 30 days prior written notice of any change in the name (including any fictitious name) or principal place of business or residence of Customer or any Guarantor.

(f) **Continuity.** Except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld: (i) Customer shall not be a party to any merger or consolidation with, or purchase or otherwise acquire all or substantially all of the assets of, or any material stock, partnership, joint venture or other equity interest in, any person or entity, or sell, transfer or lease all or any substantial part of its assets, if any such action would result in either: (A) a material change in the principal business, ownership or control of



Customer, or (B) a material adverse change in the financial condition or operations of Customer; (ii) Customer shall preserve its existence and good standing in the jurisdictions of establishment and operation and shall not operate in any material business substantially different from its business in effect as of the date of application by Customer for credit from MLBFS; and (iii) Customer shall not cause or permit any material change in its controlling ownership.

## 7. COLLATERAL

(a) **Pledge of Collateral.** To secure payment and performance of the Obligations, Customer hereby pledges, assigns, transfers and sets over to MLBFS, and grants to MLBFS first liens and security interests in and upon all of the Collateral, subject only to Permitted Liens.

(b) **Liens.** Except upon the prior written consent of MLBFS, Customer shall not create or permit to exist any lien, encumbrance or security interest upon or with respect to any Collateral now owned or hereafter acquired other than Permitted Liens.

(c) **Performance of Obligations.** Customer shall perform all of its obligations owing on account of or with respect to the Collateral; it being understood that nothing herein, and no action or inaction by MLBFS, under this Loan Agreement or otherwise, shall be deemed an assumption by MLBFS of any of Customer's said obligations.

(d) **Sales and Collections.** So long as no Event of Default shall have occurred and is continuing, Customer may in the ordinary course of its business: (i) sell any Inventory normally held by Customer for sale, (ii) use or consume any materials and supplies normally held by Customer for use or consumption, and (iii) collect all of its Accounts. Customer shall take such action with respect to protection of its Inventory and the other Collateral and the collection of its Accounts as MLBFS may from time to time reasonably request.

(e) **Account Schedules.** Upon the request of MLBFS, made now or at any reasonable time or times hereafter, Customer shall deliver to MLBFS, in addition to the other information required hereunder, a schedule identifying, for each Account and all Chattel Paper subject to MLBFS' security interests hereunder, each Account Debtor by name and address and amount, invoice or contract number and date of each invoice or contract. Customer shall furnish to MLBFS such additional information with respect to the Collateral, and amounts received by Customer as proceeds of any of the Collateral, as MLBFS may from time to time reasonably request.

(f) **Alterations and Maintenance.** Except upon the prior written consent of MLBFS, Customer shall not make or permit any material alterations to any tangible Collateral which might materially reduce or impair its market value or utility. Customer shall at all times keep the tangible Collateral in good condition and repair and shall pay or cause to be paid all obligations arising from the repair and maintenance of such Collateral, as well as all obligations with respect to each Location of Tangible Collateral, except for any such obligations being contested by Customer in good faith by appropriate proceedings.

(g) **Location.** Except for movements required in the ordinary course of Customer's business, Customer shall give MLBFS 30 days' prior written notice of the placing at or movement of any tangible Collateral to any location other than a Location of Tangible Collateral. In no event shall Customer cause or permit any material tangible Collateral to be removed from the United States without the express prior written consent of MLBFS.

(h) **Insurance.** Customer shall insure all of the tangible Collateral under a policy or policies of physical damage insurance providing that losses will be payable to MLBFS as its interests may appear pursuant to a Lender's Loss Payable Endorsement and containing such other provisions as may be reasonably required by MLBFS. Customer shall further provide and maintain a policy or policies of comprehensive public liability insurance naming MLBFS as an additional party insured. Customer shall maintain such other insurance as may be required by law or is customarily maintained by companies in a similar business or otherwise reasonably required by MLBFS. All such insurance shall provide that MLBFS will receive not less than 10 days prior written notice of any cancellation, and shall otherwise be in form and amount and with an insurer or insurers reasonably acceptable to MLBFS. Customer shall furnish MLBFS with a copy or certificate of



each such policy or policies and, prior to any expiration or cancellation, each renewal or replacement thereof.

(i) **Event of Loss.** Customer shall at its expense promptly repair all repairable damage to any tangible Collateral. In the event that any tangible Collateral is damaged beyond repair, lost, totally destroyed or confiscated (an "Event of Loss") and such Collateral had a value prior to such Event of Loss of $25,000.00 or more, then, on or before the first to occur of (i) 90 days after the occurrence of such Event of Loss, or (ii) 10 Business Days after the date on which either Customer or MLBFS shall receive any proceeds of insurance on account of such Event of Loss, or any underwriter of insurance on such Collateral shall advise either Customer or MLBFS that it disclaims liability in respect of such Event of Loss, Customer shall, at Customer's option, either replace the Collateral subject to such Event of Loss with comparable Collateral free of all liens other than Permitted Liens (in which event Customer shall be entitled to utilize the proceeds of insurance on account of such Event of Loss for such purpose, and may retain any excess proceeds of such insurance), or consent to a reduction in the Maximum WCMA Line of Credit in an amount equal to the actual cash value of such Collateral as determined by either the applicable insurance company's payment (plus any applicable deductible) or, in absence of insurance company payment, as reasonably determined by MLBFS. Notwithstanding the foregoing, if at the time of occurrence of such Event of Loss or any time thereafter prior to replacement or line reduction, as aforesaid, an Event of Default shall occur hereunder, then MLBFS may at its sole option, exercisable at any time while such Event of Default shall be continuing, require Customer to either replace such Collateral or, on its own volition and without the consent of Customer, reduce the Maximum WCMA Line of Credit, as aforesaid.

(j) **Notice of Certain Events.** Customer shall give MLBFS immediate notice of any attachment, lien, judicial process, encumbrance or claim affecting or involving $25,000.00 or more of the Collateral.

(k) **Indemnification.** Customer shall indemnify, defend and save MLBFS harmless from and against any and all claims, liabilities, losses, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) of any nature whatsoever which may be asserted against or incurred by MLBFS arising out of or in any manner occasioned by (i) the ownership, collection, possession, use or operation of any Collateral, or (ii) any failure by Customer to perform any of its obligations hereunder; excluding, however, from said indemnity any such claims, liabilities, etc. arising directly out of the willful wrongful act or active gross negligence of MLBFS. This indemnity shall survive the expiration or termination of this Loan Agreement as to all matters arising or accruing prior to such expiration or termination.

## 8. EVENTS OF DEFAULT

The occurrence of any of the following events shall constitute an "Event of Default" under this Loan Agreement:

(a) **Failure to Pay.** Customer shall fail to pay to MLBFS or deposit into the WCMA Account when due any amount owing or required to be paid or deposited by Customer under this Loan Agreement, or shall fail to pay when due any other Obligations, and any such failure shall continue for more than five (5) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(b) **Failure to Perform.** Customer or any Guarantor shall default in the performance or observance of any covenant or agreement on its part to be performed or observed under this Loan Agreement or any of the Additional Agreements (not constituting an Event of Default under any other clause of this Section), and such default shall continue unremedied for ten (10) Business Days after written notice thereof shall have been given by MLBFS to Customer.

(c) **Breach of Warranty.** Any representation or warranty made by Customer or any Guarantor contained in this Loan Agreement or any of the Additional Agreements shall at any time prove to have been incorrect in any material respect when made.

(d) **Default Under Other Agreement.** A default or Event of Default by Customer or any Guarantor shall occur under the terms of any other agreement, instrument or document with or intended for the benefit of

MLBFS, MLPF&S or any of their affiliates, and any required notice shall have been given and require passage of time shall have elapsed.

(e) **Bankruptcy Event.** Any Bankruptcy Event shall occur.

(f) **Material Impairment.** Any event shall occur which shall reasonably cause MLBFS to in good faith believe that the prospect of full payment or performance by Customer or any Guarantor of any of their respective liabilities or obligations under this Loan Agreement or any of the Additional Agreements to which Customer or such Guarantor is a party has been materially impaired.

(g) **Acceleration of Debt to Other Creditors.** Any event shall occur which results in the acceleration of the maturity of any indebtedness of $100,000.00 or more of Customer or any Guarantor to another creditor under any indenture, agreement, undertaking, or otherwise.

(h) **Seizure or Abuse of Collateral.** The Collateral, or any material part thereof, shall be or become subject to any material abuse or misuse, or any levy, attachment, seizure or confiscation which is not released within ten (10) Business Days.

## 9. REMEDIES

(a) **Remedies Upon Default.** Upon the occurrence and during the continuance of any Event of Default, MLBFS may at its sole option do any one or more or all of the following, at such time and in such order as MLBFS may in its sole discretion choose:

(i) **Termination.** MLBFS may without notice terminate the WCMA Line of Credit and all obligations to provide the WCMA Line of Credit or otherwise extend any credit to or for the benefit of Customer (it being understood, however, that upon the occurrence of any Bankruptcy Event the WCMA Line of Credit and all such obligations shall automatically terminate without any action on the part of MLBFS); and upon any such termination MLBFS shall be relieved of all such obligations.

(ii) **Acceleration.** MLBFS may declare the principal of and interest on the WCMA Loan Balance, and all other Obligations to be forthwith due and payable, whereupon all such amounts shall be immediately due and payable, without presentment, demand for payment, protest and notice of protest, notice of dishonor, notice of acceleration, notice of intent to accelerate or other notice or formality of any kind, all of which are hereby expressly waived; provided, however, that upon the occurrence of any Bankruptcy Event all such principal, interest and other Obligations shall automatically become due and payable without any action on the part of MLBFS.

(iii) **Exercise Rights of Secured Party.** MLBFS may exercise any or all of the remedies of a secured party under applicable law, including, but not limited to, the UCC, and any or all of its other rights and remedies under this Loan Agreement and the Additional Agreements.

(iv) **Possession.** MLBFS may require Customer to make the Collateral and the records pertaining to the Collateral available to MLBFS at a place designated by MLBFS which is reasonably convenient to Customer, or may take possession of the Collateral and the records pertaining to the Collateral without the use of any judicial process and without any prior notice to Customer.

(v) **Sale.** MLBFS may sell any or all of the Collateral at public or private sale upon such terms and conditions as MLBFS may reasonably deem proper. MLBFS may purchase any Collateral at any such public sale. The net proceeds of any such public or private sale and all other amounts actually collected or received by MLBFS pursuant hereto, after deducting all costs and expenses incurred at any time in the collection of the Obligations and in the protection, collection and sale of the Collateral, will be applied to the payment of the Obligations, with any remaining proceeds paid to Customer or whoever else may be entitled thereto, and with Customer and each Guarantor remaining jointly and severally liable for any amount remaining unpaid after such application.

(vi) **Delivery of Cash, Checks, Etc.** MLBFS may require Customer to forthwith upon receipt, transmit and deliver to MLBFS in the form received, all cash, checks, drafts and other instruments for the payment of money (properly endorsed, where required, so that such items may be collected by MLBFS) which may be received by Customer at any time in full or partial payment of any Collateral, and require that Customer not commingle any such items which may be so received by Customer with any other of its funds or property but instead hold them separate and apart and in trust for MLBFS until delivery is made to MLBFS.

(vii) **Notification of Account Debtors.** MLBFS may notify any Account Debtor that its Account or Chattel Paper has been assigned to MLBFS and direct such Account Debtor to make payment directly to MLBFS of all amounts due or becoming due with respect to such Account or Chattel Paper; and MLBFS may enforce payment and collect, by legal proceedings or otherwise, such Account or Chattel Paper.

(viii) **Control of Collateral.** MLBFS may otherwise take control in any lawful manner of any cash or non-cash items of payment or proceeds of Collateral and of any rejected, returned, stopped in transit or repossessed goods included in the Collateral and endorse Customer's name on any item of payment on or proceeds of the Collateral.

(b) **Set-Off.** MLBFS shall have the further right upon the occurrence and during the continuance of an Event of Default to set-off, appropriate and apply toward payment of any of the Obligations, in such order of application as MLBFS may from time to time and at any time elect, any cash, credit, deposits, accounts, securities and any other property of Customer which is in transit to or in the possession, custody or control of MLBFS, MLPF&S or any agent, bailee, or affiliate of MLBFS or MLPF&S, including, without limitation, the WCMA Account and any Money Accounts, and all cash, securities and other financial assets therein or controlled thereby, and all proceeds thereof. Customer hereby collaterally assigns and grants to MLBFS a continuing security interest in all such property as additional Collateral.

(c) **Power of Attorney.** Effective upon the occurrence and during the continuance of an Event of Default, Customer hereby irrevocably appoints MLBFS as its attorney-in-fact, with full power of substitution, in its place and stead and in its name or in the name of MLBFS, to from time to time in MLBFS' sole discretion take any action and to execute any instrument which MLBFS may deem necessary or advisable to accomplish the purposes of this Loan Agreement, including, but not limited to, to receive, endorse and collect all checks, drafts and other instruments for the payment of money made payable to Customer included in the Collateral.

(d) **Remedies are Severable and Cumulative.** All rights and remedies of MLBFS herein are severable and cumulative and in addition to all other rights and remedies available in the Additional Agreements, at law or in equity, and any one or more of such rights and remedies may be exercised simultaneously or successively.

(e) **Notices.** To the fullest extent permitted by applicable law, Customer hereby irrevocably waives and releases MLBFS of and from any and all liabilities and penalties for failure of MLBFS to comply with any statutory or other requirement imposed upon MLBFS relating to notices of sale, holding of sale or reporting of any sale, and Customer waives all rights of redemption or reinstatement from any such sale. Any notices required under applicable law shall be reasonably and properly given to Customer if given by any of the methods provided herein at least 5 Business Days prior to taking action. MLBFS shall have the right to postpone or adjourn any sale or other disposition of Collateral at any time without giving notice of any such postponed or adjourned date. In the event MLBFS seeks to take possession of any or all of the Collateral by court process, Customer further irrevocably waives to the fullest extent permitted by law any bonds and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession, and any demand for possession prior to the commencement of any suit or action.

**10. MISCELLANEOUS**

(a) **Non-Waiver.** No failure or delay on the part of MLBFS in exercising any right, power or remedy pursuant to this Loan Agreement or any of the Additional Agreements shall operate as a waiver thereof, and no single or partial exercise of any such right, power or remedy shall preclude any other or further exercise thereof, or the exercise of any other right, power or remedy. Neither any waiver of any provision of this Loan

Agreement or any of the Additional Agreements, nor any consent to any departure by Customer therefrom shall be effective unless the same shall be in writing and signed by MLBFS. Any waiver of any provision of this Loan Agreement or any of the Additional Agreements and any consent to any departure by Customer from the terms of this Loan Agreement or any of the Additional Agreements shall be effective only in the specific instance and for the specific purpose for which given. Except as otherwise expressly provided herein, no notice to or demand on Customer shall in any case entitle Customer to any other or further notice or demand in similar or other circumstances.

(b) **Disclosure.** Customer hereby irrevocably authorizes MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about Customer. In connection with said authorization, the parties recognize that in order to provide a WCMA Line of Credit certain information about Customer is required to be made available on a computer network accessible by certain affiliates of MLBFS, including MLPF&S.

(c) **Communications.** All notices and other communications required or permitted hereunder shall be in writing, and shall be either delivered personally, mailed by postage prepaid certified mail or sent by express overnight courier or by facsimile. Such notices and communications shall be deemed to be given on the date of personal delivery, facsimile transmission or actual delivery of certified mail, or one Business Day after delivery to an express overnight courier. Unless otherwise specified in a notice sent or delivered in accordance with the terms hereof, notices and other communications in writing shall be given to the parties hereto at their respective addresses set forth at the beginning of this Loan Agreement, or, in the case of facsimile transmission, to the parties at their respective regular facsimile telephone number.

(d) **Costs, Expenses and Taxes.** Customer shall upon demand pay or reimburse MLBFS for: (i) all Uniform Commercial Code filing and search fees and expenses incurred by MLBFS in connection with the verification, perfection or preservation of MLBFS' rights hereunder or in the Collateral or any other collateral for the Obligations; (ii) any and all stamp, transfer and other taxes and fees payable or determined to be payable in connection with the execution, delivery and/or recording of this Loan Agreement or any of the Additional Agreements; and (iii) all reasonable fees and out-of-pocket expenses (including, but not limited to, reasonable fees and expenses of outside counsel) incurred by MLBFS in connection with the collection of any sum payable hereunder or under any of the Additional Agreements not paid when due, the enforcement of this Loan Agreement or any of the Additional Agreements and the protection of MLBFS' rights hereunder or thereunder, excluding, however, salaries and normal overhead attributable to MLBFS' employees. The obligations of Customer under this paragraph shall survive the expiration or termination of this Loan Agreement and the discharge of the other Obligations.

(e) **Right to Perform Obligations.** If Customer shall fail to do any act or thing which it has covenanted to do under this Loan Agreement or any representation or warranty on the part of Customer contained in this Loan Agreement shall be breached, MLBFS may, in its sole discretion, after 5 days written notice is sent to Customer (or such lesser notice, including no notice, as is reasonable under the circumstances), do the same or cause it to be done or remedy any such breach, and may expend its funds for such purpose. Any and all reasonable amounts so expended by MLBFS shall be repayable to MLBFS by Customer upon demand, with interest at the Interest Rate during the period from and including the date funds are so expended by MLBFS to the date of repayment, and all such amounts shall be additional Obligations. The payment or performance by MLBFS of any of Customer's obligations hereunder shall not relieve Customer of said obligations or of the consequences of having failed to pay or perform the same, and shall not waive or be deemed a cure of any Event of Default.

(f) **Late Charge.** Any payment required to be made by Customer pursuant to this Loan Agreement not paid within ten (10) days of the applicable due date shall be subject to a late charge in an amount equal to the lesser of: (i) 5% of the overdue amount, or (ii) the maximum amount permitted by applicable law. Such late charge shall be payable on demand, or, without demand, may in the sole discretion of MLBFS be paid by a WCMA Loan and added to the WCMA Loan Balance in the same manner as provided herein for accrued interest.

(g) **Further Assurances.** Customer agrees to do such further acts and things and to execute and deliver t
MLBFS such additional agreements, instruments and documents as MLBFS may reasonably require c
deem advisable to effectuate the purposes of this Loan Agreement or any of the Additional Agreements, c
to establish, perfect and maintain MLBFS' security interests and liens upon the Collateral, including, but nc
limited to: (i) executing financing statements or amendments thereto when and as reasonably requested b
MLBFS; and (ii) if in the reasonable judgment of MLBFS it is required by local law, causing the owner
and/or mortgagees of the real property on which any Collateral may be located to execute and deliver t
MLBFS waivers or subordinations reasonably satisfactory to MLBFS with respect to any rights in suc
Collateral.

(h) **Binding Effect.** This Loan Agreement and the Additional Agreements shall be binding upon, and shal
inure to the benefit of MLBFS, Customer and their respective successors and assigns. Customer shall no
assign any of its rights or delegate any of its obligations under this Loan Agreement or any of the Additiona
Agreements without the prior written consent of MLBFS. Unless otherwise expressly agreed to in a writing
signed by MLBFS, no such consent shall in any event relieve Customer of any of its obligations under this
Loan Agreement or the Additional Agreements.

(i) **Headings.** Captions and section and paragraph headings in this Loan Agreement are inserted only as a
matter of convenience, and shall not affect the interpretation hereof.

(j) **Governing Law.** This Loan Agreement, and, unless otherwise expressly provided therein, each of the
Additional Agreements, shall be governed in all respects by the laws of the State of Illinois.

(k) **Severability of Provisions.** Whenever possible, each provision of this Loan Agreement and the
Additional Agreements shall be interpreted in such manner as to be effective and valid under applicable law.
Any provision of this Loan Agreement or any of the Additional Agreements which is prohibited or
unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective only to the extent of such
prohibition or unenforceability without invalidating the remaining provisions of this Loan Agreement and the
Additional Agreements or affecting the validity or enforceability of such provision in any other jurisdiction.

(l) **Term.** This Loan Agreement shall become effective on the date accepted by MLBFS at its office in
Chicago, Illinois, and, subject to the terms hereof, shall continue in effect so long thereafter as the WCMA
Line of Credit shall be in effect or there shall be any Obligations outstanding.

(m) **Counterparts.** This Loan Agreement may be executed in one or more counterparts which, when taken
together, constitute one and the same agreement.

(n) **Jurisdiction; Waiver.** CUSTOMER ACKNOWLEDGES THAT THIS LOAN AGREEMENT IS BEING
ACCEPTED BY MLBFS IN PARTIAL CONSIDERATION OF MLBFS' RIGHT AND OPTION, IN ITS SOLE
DISCRETION, TO ENFORCE THIS LOAN AGREEMENT AND THE ADDITIONAL AGREEMENTS IN
EITHER THE STATE OF ILLINOIS OR IN ANY OTHER JURISDICTION WHERE CUSTOMER OR ANY
COLLATERAL FOR THE OBLIGATIONS MAY BE LOCATED. CUSTOMER CONSENTS TO
JURISDICTION IN THE STATE OF ILLINOIS AND VENUE IN ANY STATE OR FEDERAL COURT IN
THE COUNTY OF COOK FOR SUCH PURPOSES, AND CUSTOMER WAIVES ANY AND ALL RIGHTS
TO CONTEST SAID JURISDICTION AND VENUE. CUSTOMER FURTHER WAIVES ANY RIGHTS TO
COMMENCE ANY ACTION AGAINST MLBFS IN ANY JURISDICTION EXCEPT IN THE COUNTY OF
COOK AND STATE OF ILLINOIS. MLBFS AND CUSTOMER HEREBY EACH EXPRESSLY WAIVE ANY
AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM
BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY WITH RESPECT TO ANY
MATTER RELATING TO, ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE WCMA LINE OF
CREDIT, THIS LOAN AGREEMENT, ANY ADDITIONAL AGREEMENTS AND/OR ANY OF THE
TRANSACTIONS WHICH ARE THE SUBJECT MATTER OF THIS LOAN AGREEMENT.

(o) **Integration.** THIS LOAN AGREEMENT, TOGETHER WITH THE ADDITIONAL AGREEMENTS,
CONSTITUTES THE ENTIRE UNDERSTANDING AND REPRESENTS THE FULL AND FINAL
AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, AND



MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR WRITTEN AGREEMENTS OR PRIOR CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE N UNWRITTEN ORAL AGREEMENTS OF THE PARTIES. WITHOUT LIMITING THE FOREGOING CUSTOMER ACKNOWLEDGES THAT: (I) NO PROMISE OR COMMITMENT HAS BEEN MADE TO I BY MLBFS, MLPF&S OR ANY OF THEIR RESPECTIVE EMPLOYEES, AGENTS O REPRESENTATIVES TO EXTEND THE AVAILABILITY OF THE WCMA LINE OF CREDIT OR THE DU DATE OF THE WCMA LOAN BALANCE BEYOND THE CURRENT MATURITY DATE, OR T INCREASE THE MAXIMUM WCMA LINE OF CREDIT, OR OTHERWISE EXTEND ANY OTHER CREDI TO CUSTOMER OR ANY OTHER PARTY; (II) NO PURPORTED EXTENSION OF THE MATURIT DATE, INCREASE IN THE MAXIMUM WCMA LINE OF CREDIT OR OTHER EXTENSION OI AGREEMENT TO EXTEND CREDIT SHALL BE VALID OR BINDING UNLESS EXPRESSLY SE FORTH IN A WRITTEN INSTRUMENT SIGNED BY MLBFS; AND (III) EXCEPT AS OTHERWISI EXPRESSLY PROVIDED HEREIN, THIS LOAN AGREEMENT SUPERSEDES AND REPLACES AN' AND ALL PROPOSALS, LETTERS OF INTENT AND APPROVAL AND COMMITMENT LETTERS FROM MLBFS TO CUSTOMER, NONE OF WHICH SHALL BE CONSIDERED AN ADDITIONAL AGREEMENT NO AMENDMENT OR MODIFICATION OF THIS AGREEMENT OR ANY OF THE ADDITIONAL AGREEMENTS TO WHICH CUSTOMER IS A PARTY SHALL BE EFFECTIVE UNLESS IN A WRITING SIGNED BY BOTH MLBFS AND CUSTOMER.

IN WITNESS WHEREOF, this Loan Agreement has been executed as of the day and year first above written.

D.M.S. DIAMOND CO., INC.

By: _X̲ ̲M̲a̲r̲c̲ ̲S̲t̲e̲i̲n̲b̲e̲r̲g̲_____    _X̲_____
             Signature (1)                    Signature (2)

X̲ ̲M̲A̲R̲C̲ ̲S̲T̲E̲I̲N̲B̲E̲R̲G̲_____    _X̲_____
          Printed Name                    Printed Name

X̲ ̲P̲r̲e̲s̲i̲d̲e̲n̲t̲_____    _X̲_____
          Title                               Title

Accepted at Chicago, Illinois:
MERRILL LYNCH BUSINESS FINANCIAL
SERVICES INC.

By: _Tillman_____

\\mh\sys2\word\creditw\writeups\16810.doc

# EXHIBIT B

 **Merrill Lynch**

Ref. No. 885-0779

# UNCONDITIONAL GUARANTY

**FOR VALUE RECEIVED, and in order to induce MERRILL LYNCH BUSINESS FINANCIAL SERVICES** INC. ("MLBFS") to advance moneys or extend or continue to extend credit to or for the benefit of D.M.S DIAMOND CO., INC., a corporation organized and existing under the laws of the State of New York (with any successor-in-interest, including, without limitation, any successor by merger or by operation of law herein collectively referred to as "Customer") under: (a) that certain WCMA NOTE, LOAN AND SECURITY AGREEMENT NO. 885-07794 between MLBFS and Customer (the "Loan Agreement"), (b) any "Additional Agreements", as that term is defined in the Loan Agreement, and (c) all present and future amendments, restatements, supplements and other evidences of any extensions, increases, renewals, modifications and other changes of or to the Loan Agreement or Additional Agreements (collectively, the "Guaranteed Documents"), the undersigned ("Guarantor") hereby unconditionally guarantees to MLBFS: (i) the prompt and full payment when due, by acceleration or otherwise, of all sums now or any time hereafter due from Customer to MLBFS under the Guaranteed Documents, (ii) the prompt, full and faithful performance and discharge by Customer of each and every other covenant and warranty of Customer set forth in the Guaranteed Documents, and (iii) the prompt and full payment and performance of all other indebtedness, liabilities and obligations of Customer to MLBFS, howsoever created or evidenced, and whether now existing or hereafter arising (collectively, the "Obligations"). Guarantor further agrees to pay all reasonable costs and expenses (including, but not limited to, court costs and reasonable attorneys' fees) paid or incurred by MLBFS in endeavoring to collect or enforce performance of any of the Obligations, or in enforcing this Guaranty. Guarantor acknowledge that MLBFS is relying on the execution and delivery of this Guaranty in advancing moneys to or extending or continuing to extend credit to or for the benefit of Customer.

This Guaranty is absolute, unconditional and continuing and shall remain in effect until all of the Obligations shall have been fully and indefeasibly paid, performed and discharged. Upon the occurrence and during the continuance of any Event of Default under the Guaranteed Documents, any or all of the indebtedness hereby guaranteed then existing shall, at the option of MLBFS, become immediately due and payable from Guarantor (it being understood, however, that upon the occurrence of any "Bankruptcy Event", as defined in the Guaranteed Documents, all such indebtedness shall automatically become due and payable without action on the part of MLBFS). Notwithstanding the occurrence of any such event, this Guaranty shall continue and remain in full force and effect. To the extent MLBFS receives payment with respect to the Obligations, and all or any part of such payment is subsequently invalidated, declared to be fraudulent or preferential, set aside, required to be repaid by MLBFS or is repaid by MLBFS pursuant to a settlement agreement, to a trustee, receiver or any other person or entity, whether under any Bankruptcy law or otherwise (a "Returned Payment"), this Guaranty shall continue to be effective or shall be reinstated, as the case may be, to the extent of such payment or repayment by MLBFS, and the indebtedness or part thereof intended to be satisfied by such Returned Payment shall be revived and continued in full force and effect as if said Returned Payment had not been made.

The liability of Guarantor hereunder shall in no event be affected or impaired by any of the following, any of which may be done or omitted by MLBFS from time to time, without notice to or the consent of Guarantor: (a) any renewals, amendments, modifications or supplements of or to any of the Guaranteed Documents, or any extensions, forbearances, compromises or releases of any of the Obligations or any of MLBFS' rights under any of the Guaranteed Documents; (b) any acceptance by MLBFS of any collateral or security for, or other guarantees of, any of the Obligations; (c) any failure, neglect or omission on the part of MLBFS to realize upon or protect any of the Obligations, or any collateral or security therefor, or to exercise any lien upon or right of appropriation of any moneys, credits or property of Customer or any other guarantor, possessed by or under the control of MLBFS or any of its affiliates, toward the liquidation or reduction of the Obligations; (d) any invalidity, irregularity or unenforceability of all or any part of the Obligations, of any collateral security for the Obligations, or the Guaranteed Documents; (e) any application of payments or credits by MLBFS; (f) the granting of credit from time to time by MLBFS to Customer in excess of the

 

amount set forth in the Guaranteed Documents; or (g) any other act of commission or omission of any kind or at any time upon the part of MLBFS or any of its affiliates or any of their respective employees or agents with respect to any matter whatsoever. MLBFS shall not be required at any time, as a condition of Guarantor's obligations hereunder, to resort to payment from Customer or other persons or entities whatsoever, or any of their properties or estates, or resort to any collateral or pursue or exhaust any other rights or remedies whatsoever.

No release or discharge in whole or in part of any other guarantor of the Obligations shall release or discharge Guarantor or any other guarantor, unless and until all of the Obligations shall have been indefeasibly fully paid and discharged. Guarantor expressly waives presentment, protest, demand, notice of dishonor or default, notice of acceptance of this Guaranty, notice of advancement of funds under the Guaranteed Documents and all other notices and formalities to which Customer or Guarantor might be entitled, by statute or otherwise, and, so long as there are any Obligations or MLBFS is committed to extend credit to Customer, Guarantor waives any right to revoke or terminate this Guaranty without the express written consent of MLBFS.

So long as there are any Obligations, Guarantor shall not have any claim, remedy or right of subrogation, reimbursement, exoneration, contribution, indemnification, or participation in any claim, right, or remedy of MLBFS against Customer or any security which MLBFS now has or hereafter acquires, whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law, or otherwise.

MLBFS is hereby irrevocably authorized by Guarantor at any time during the continuance of an Event of Default under the Loan Agreement or any other of the Guaranteed Documents or in respect of any of the Obligations, in its sole discretion and without demand or notice of any kind, to appropriate, hold, set off and apply toward the payment of any amount due hereunder, in such order of application as MLBFS may elect, all cash, credits, deposits, accounts, securities and any other property of Guarantor which is in transit to or in the possession, custody or control of MLBFS or Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF&S"), or any of their respective agents, bailees or affiliates, including, without limitation, all securities accounts with MLPF&S and all cash, securities and other financial assets therein or controlled thereby, and all proceeds thereof. Guarantor hereby collaterally assigns and grants to MLBFS a continuing security interest in all such property as additional security for the Obligations. Upon the occurrence and during the continuance of an Event of Default, MLBFS shall have all rights in such property available to collateral assignees and secured parties under all applicable laws, including, without limitation, the Uniform Commercial Code.

Guarantor agrees to furnish to MLBFS such financial information concerning Guarantor as may be required by any of the Guaranteed Documents or as MLBFS may otherwise from time to time reasonably request. Guarantor further hereby irrevocably authorizes MLBFS and each of its affiliates, including without limitation MLPF&S, to at any time (whether or not an Event of Default shall have occurred) obtain from and disclose to each other any and all financial and other information about Guarantor.

Guarantor warrants and agrees that: (a) unless clearly stated or noted, no material assets shown on any financial statements of Guarantor heretofore or hereafter furnished to MLBFS are or will be held in an irrevocable trust, pension trust, retirement trust, IRA or other trust or form of ownership exempt from execution by creditors of Guarantor; and, (b) except upon the prior written consent of MLBFS, which consent will not be unreasonably withheld, Guarantor will not hereafter transfer any material assets of Guarantor to any trust or third party if the effect thereof will be to cause such assets to be exempt from execution by creditors of Guarantor (excluding, however, normal and reasonable contributions to pension plans, retirement plans, etc., and IRA rollovers).

No delay on the part of MLBFS in the exercise of any right or remedy under the Guaranteed Documents, this Guaranty or any other agreement shall operate as a waiver thereof, and, without limiting the foregoing, no delay in the enforcement of any security interest, and no single or partial exercise by MLBFS of any right or remedy shall preclude any other or further exercise thereof or the exercise of any other right or remedy. This Guaranty may be executed in any number of counterparts, each of which counterparts, once they are executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same Guaranty. This Guaranty shall be binding upon Guarantor and

Guarantor's heirs and personal representatives, and shall inure to the benefit of MLBFS and its successor and assigns.

This Guaranty shall be governed by the laws of the State of Illinois. **WITHOUT LIMITING THE RIGHT O MLBFS TO ENFORCE THIS GUARANTY IN ANY JURISDICTION AND VENUE PERMITTED B' APPLICABLE LAW, GUARANTOR AGREES THAT THIS GUARANTY MAY AT THE OPTION OF MLBF: BE ENFORCED BY MLBFS IN ANY JURISDICTION AND VENUE IN WHICH ANY OF THI GUARANTEED DOCUMENTS MAY BE ENFORCED. GUARANTOR AND MLBFS HEREBY EACH EXPRESSLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES AGAINST THE OTHER PARTY IN AN' WAY RELATED TO OR ARISING OUT OF THIS GUARANTY OR THE OBLIGATIONS.** Whereve possible each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty. No modification or waiver of any of the provisions of this Guaranty shall be effective unless in writing and signed by Guarantor and an office of MLBFS.

Dated as of November 24, 1997.

Guarantor:

X _____
**MARC STEINBERG**

Witness: X _____

Printed Name: X ED O'BRIEN

Address:

2467 Logue Street
N. Bellmore, NY 11710

-2-

As of the close of business March 24, 2006, $393,108.92 is outstanding under the Loan Documents, consisting of $391,070.35 of principal and $2,038.57 in accrued interest. Additional interest and other charges under the Loan Documents will continue to accrue on and after the date of this letter, thereby increasing the Obligations owed.

**Demand is hereby made upon Obligors, and each of them, to fully repay the Obligations by 5PM CST on March 31, 2006. If MLBFS does not receive a full payoff on or before March 31, 2006, a late charge in the amount of 5% of all outstanding Obligations will be charged to the account.**

Please be advised that notwithstanding anything contained in this letter, this letter (i) does not in any manner constitute any waiver of either (a) any of our rights, remedies or powers pursuant to the Loan Documents or any other agreement, document, or instrument or applicable law or (b) any Event of Default (howsoever defined) under the Loan Documents; and (ii) is not to be construed as an agreement by us to allow any cure periods at a later date not specifically provided for in the Loan Documents or any other applicable agreement, document or instrument.

I trust that you will give this matter your foremost attention.

Sincerely,

Bill Sardegna
Assistant Vice President


cc:    Marc Steinberg
       2467 Logue Street
       N. Bellmore, NY 11710
       (Via Overnight Courier)

       Stephan E. Rothe
       (Via Electronic Mail)

       Jonathan Kenyon
       (Via Electronic Mail)

**EXHIBIT G**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------x
MERRILL LYNCH BUSINESS FINANCIAL
SERVICES, INC.,                                                      07 CV 7048  (LP)

                                        Plaintiff,              ANSWER

                -against-

D.M.S. DIAMOND CO., INC., MARC
STEINBERG, and "JOHN DOE #1 through
"JOHN DOE #12," the last twelve names
being fictitious and unknown to plaintiff, being
persons having or claiming an interest in or lien
upon the Collateral described in the Complaint,

                                        Defendants.
----------------------------------------------------x

  Defendants, by their attorney, DAVID H. LEDGIN, Esq., answer the Complaint as
follows:

  1.  Admit the allegations of paragraphs 2, 3, 6, 7, 8, 9, 10, 11, 12 and 17;

  2.  Admit, with respect to paragraph 13, that the subject agreement expired on November
30, 1998 but deny , as worded, the balance of the allegations in said paragraph;

  3.  Deny knowledge or information sufficient to form a belief with respect to the
allegations of paragraphs 1 and 4; and

  4.  Deny as worded, each and every allegation contained in paragraphs 5, 14, 15, 16, 18,
19, 20, 21, 22, 23, 24, 25, 26 and 27.

<u>Defenses/Affirmative Defenses</u>

I.

  5.  Plaintiff is in prior breach of the parties' contract.

II.

6.   The plaintiff, by accepting and endorsing monthly repayment checks signed by the defendants on a regular, monthly basis from March of 2006 to the present, including subsequently to the commencement of the instant action, has modified any agreement it had with defendants such that the repayment amount has been, with interest and late fees charged, $8,000 per month.

III.

7.   If, as plaintiff claims, the defendants breached the parties' agreement in early 2006, and plaintiff continued and still continues to accept monthly repayments from the defendants, then the plaintiff is guilty of laches and of bad faith in commencing the instant action, the latter for the reason that, given plaintiff's position as a creditor and defendants' financial condition, plaintiff cannot possibly obtain repayment more quickly -- if at all -- by maintaining and prevailing upon the instant action.

IV.

8.   No collateral in which any defendant has an interest, is owned solely by such defendants, and thus no collateral is free to simply be turned over to the plaintiff without impairing proprietary and ownership rights of others; therefore, plaintiff has failed to join indispensable parties to the instant action, to wit:  the many other persons with whom defendants' inventory/collateral, is jointly or partly owned, whose names and identities   are and were discoverable prior to the initiation of the present action.

WHEREFORE, defendants demand a judgment dismissing the Complaint herein.

Dated: Mineola, NY
        September 19, 2007

DAVID H. LEDGIN (DL-8188)

_Attorney for Defendants_
1539 Franklin Avenue
Mineola, NY 11501
Phone: 516 747-1210
Fax:     516 747-1211
e-mail:  davidledgin@aol.com

**EXHIBIT H**



TOTAL MERRILL

Primary Account: 885-07794

# YOUR MERRILL LYNCH REPORT

September 29, 2007 - October 31, 2007

## PORTFOLIO SUMMARY

| | October 31 | September 28 | Month Change |
|---|---|---|---|
| **Net Portfolio Value** | | | |
| Your assets | | | |
| Your liabilities | | | |
| Your Net Cash Flow (Inflows/Outflows) | | | |
| Securities You Transferred In/Out | | | |
| **Subtotal Net Contributions** | | | |
| Your Dividends/Interest Income | | | |
| Your Market Change | | | |
| **Subtotal Investment Earnings** | | | |



DMS DIAMOND CO., INC
10 W 47TH ST
NEW YORK NY 10036-3301

**Need Investment Guidance?**
**Call Your Financial Advisor**

**Your Financial Advisor:**
STEPHAN E ROTHE
717 5TH AVE 7TH FL
NEW YORK NY   10022
stephan_rothe@ml.com
(800) 999-6371

**If you have questions on your statement,**
**call 24-Hour Assistance:**
(866) 4MLBUSINESS
(866) 465-2874

Up-to-date account information can be viewed at: www.businesscenter.ml.com, where your statements are archived for three or more years.

# NEW MERRILL LYNCH PRODUCTS PROTECT YOUR FINANCIAL SECURITY

Merrill Lynch now offers Preferred Identity Theft Restoration assistance and Credit Monitoring. Contact your Financial Advisor for details.

This page intentionally left blank

**TOTAL MERRILL**

Online at: **www.businesscenter.ml.com**

Account Number: 885-07794

24-Hour Assistance: (866) 4MLBUSINESS

**Net Portfolio Value:**                                                    **$ 0.00**

**Your Financial Advisor:**
STEPHAN E ROTHE
717 5TH AVE 7TH FL
NEW YORK NY   10022
stephan_rothe@ml.com
(800) 999-6371

DMS DIAMOND CO., INC
10 W 47TH ST
NEW YORK NY 10036-3301

# ■ WCMA® ACCOUNT

## ASSETS

| | October 31 | September 28 |
|---|---|---|
| Cash/Money Accounts | · | · |
| Fixed Income | · | · |
| Equities | · | · |
| Mutual Funds | · | · |
| Options | · | · |
| Other | · | · |
| Subtotal (Long Portfolio) | · | · |
| **TOTAL ASSETS** | · | · |

## LIABILITIES

| | | |
|---|---|---|
| Debit Balance | · | · |
| Short Market Value | · | · |
| **TOTAL LIABILITIES** | · | · |
| **NET PORTFOLIO VALUE** | · | · |

## CASH FLOW

September 29, 2007 - October 31, 2007

| | This Statement | Year to Date |
|---|---|---|
| **Opening Cash/Money Accounts** | · | |
| **CREDITS** | | |
| Funds Received | 8,000.00 | 80,000.00 |
| Electronic Transfers | · | · |
| Other Credits | · | · |
| Subtotal | 8,000.00 | 80,000.00 |
| **DEBITS** | | |
| Electronic Transfers | · | · |
| Margin Interest Charged | · | · |
| Other Debits/WCMA Loan | (8,000.00) | (80,000.00) |
| Visa Purchases (debits) | · | · |
| ATM/Cash Advances | · | · |
| Checks Written/Bill Payment | · | · |
| Subtotal | (8,000.00) | (80,000.00) |
| **Net Cash Flow** | · | · |
| Dividends/Interest Income | · | · |
| Security Purchases/Debits | · | · |
| Security Sales/Credits | · | · |
| **Closing Cash/Money Accounts** | · | · |
| Securities You Transferred In/Out | · | · |

DMS DIAMOND CO., INC

Account Number: 885-07794

24-Hour Assistance: (866) 4MLBUSINESS

## YOUR WCMA TRANSACTIONS

September 29, 2007 - October 31, 2007

### CASH/OTHER TRANSACTIONS

| Date | Transaction Type | Quantity | Description | Debit | Credit |
|---|---|---|---|---|---|
| 10/05 | Funds Received | | CHECK DEPOSIT | | 8,000.00 |
| | | | Deposit Sub-Total | | 8,000.00 |
| | *Subtotal (Funds Received)* | | | | *8,000.00* |
| 10/01 | WCMA Loan Int | | COMMERCIAL LOAN INT | 2,340.07 | |
| 10/01 | Loan Advanced | | WCMA LOAN ADVANCED | | 2,340.07 |
| 10/09 | Loan Payment | | WCMA LOAN PAYMENT | 8,000.00 | |
| | *Subtotal (Other Debits/Credits)* | | | *10,340.07* | *2,340.07* |

NET TOTAL

### LOAN ACCOUNT ACTIVITY

Loan by Merrill Lynch Business Financial Services
Line of Credit .00 Limit

| Effective Date | Description | Amount | Loan Balance | Interest From | Calculated To | Number of Days | Interest Rate* | Interest Accrued |
|---|---|---|---|---|---|---|---|---|
| 10/01 | Opening Balance | | 314,722.88 | | | | | |
| 10/01 | Loan Advance | 2,340.07 | 317,062.95 | 10/01 | 10/03 | 2 | 8.45% | 148.85 |
| 10/03 | Loan Balance | | 317,062.95 | 10/03 | 10/05 | 2 | 8.50% | 149.72 |
| 10/05 | Loan Balance | | 317,062.95 | 10/05 | 10/09 | 4 | 8.45% | 297.69 |
| 10/09 | Loan Payment | 8,000.00CR | 309,062.95 | 10/09 | 10/12 | 3 | 8.45% | 217.63 |
| 10/12 | Loan Balance | | 309,062.95 | 10/12 | 10/15 | 3 | 8.43% | 217.12 |
| 10/15 | Loan Balance | | 309,062.95 | 10/15 | 10/18 | 3 | 8.45% | 217.63 |
| 10/18 | Loan Balance | | 309,062.95 | 10/18 | 10/29 | 11 | 8.38% | 791.37 |
| 10/29 | Loan Balance | | 309,062.95 | 10/29 | 10/31 | 2 | 8.18% | 140.45 |
| 10/31 | Loan Balance | | 309,062.95 | 10/31 | 11/01 | 1 | 8.12% | 69.72 |
| 10/31 | Closing Balance | | 309,062.95 | | | | | |

The total interest due for the period 10/01/07 to 11/01/07 is 2,250.18 and will be charged to your WCMA Account on the first business day of November.
* Interest Rate: 30 DAY COMMERCIAL PAPER Plus 3.40% (see your loan documentation for further information).
WCMA Loan Interest Paid Year-to-Date 25,104.98.

This page intentionally left blank

# Merrill Lynch

## Agreement Regarding Your Securities Account and Other Important Information

You, the Client, and we, Merrill Lynch, Pierce, Fenner & Smith Inc. (Merrill Lynch), agree as follows:

(1) We will direct your order for a security or option to the marketplace we consider to be the primary market for that security or option.

(2) We will hold bonds and preferred stocks in bulk segregation (except for those held in custodian accounts). In the event of a call for less than an entire issue or series of those securities, the securities to be called will be randomly selected from those held in bulk.

(3) We are not responsible for the loss or destruction of securities that are placed in the custody of a non-U.S. bank or broker or the custodian, and are lost or destroyed as a result of war, civil commotion, enemy action, government acts or any other causes beyond the control of the depository or agent.

(4) This statement of account shall be deemed conclusive if not objected to within ten (10) days. Promptly report any inaccuracy to Merrill Lynch Client Services at (800) MER-RILL. To protect your rights, oral communications should be re-confirmed by you in writing.

(5) We receive a fee from ISA® banks of up to 2% per annum of the average daily balances. We receive a fee from our affiliated banks of up to $30 per annum for each retirement account and $65 per annum for each non-retirement account that sweeps balances to the banks under the RASP ℠ and ML bank deposit programs.

(6) You will have the right to vote full shares, and we may solicit instructions concerning the voting of full shares held in your account. The voting shares in your account will be governed by the rules and procedures of the New York Stock Exchange and the Securities and Exchange Commission then in effect, or other applicable regulations.

(7) This statement serves as a confirmation of purchases that result from automatic reinvestment transactions, as well as your AIPS transactions, during the statement period.

(8) As an option client, please advise us promptly of any material change in your investment objectives or financial condition. Individual options commission charges have been included in your confirmation; a summary is available to you upon request. Information will be made available to you upon request.

(9) All transactions in your account are subject to the constitution, rules, regulations, customs, usages, rulings and interpretations of the exchange or market, and its clearinghouse, if any, where the transactions are executed, and if not executed on any exchange, the National Association of Securities Dealers, Inc.

(10) We trade for our own accounts as an odd lot dealer, a block positioner and/or arbitrageur. At the time of any transaction in your account, we or an affiliate may have a long or short position in the same security, and our positions may be completely or partially hedged.

(11) We may use your free credit balance in our business and such funds are not segregated. You have the right to receive, in the normal course of business, any free credit balance and any fully paid securities to which you are entitled, subject to any open commitments in any of your accounts.

(12) Merrill Lynch's financial statement is available for your inspection at our office, or a copy will be mailed upon request to: Merrill Lynch, WFC-NT, New York, N.Y. 10281.

(13) If this statement is for a margin account, it is a combined statement of your margin account and special memorandum account maintained for you pursuant to applicable regulations. The permanent record of the separate account as required by Regulation T is available for your inspection upon request. You should retain this statement for use with your next statement to calculate interest charges, if any, for the period covered by this statement. The interest charge period will parallel the statement period, except that interest due for the final day of the statement period will be carried over and appear on your next statement.

(14) The Securities Investor Protection Corporation (SIPC) and our excess-SIPC bond do not cover assets that are not securities or assets that are not held at Merrill Lynch, such as cash on deposit at Merrill Lynch Bank USA and Merrill Lynch Bank & Trust Co., FSB (the ML Banks), or other depository institutions. Those deposits are protected by the Federal Deposit Insurance Corporation. Merrill Lynch is not a bank. Unless otherwise disclosed, investments through Merrill Lynch ARE NOT FDIC INSURED, ARE NOT BANK GUARANTEED, AND MAY LOSE VALUE. To obtain information about SIPC, including the SIPC Brochure, contact SIPC at <<http://www.sipc.org>> or (202) 371-8300.

(15) Merrill Lynch bears no responsibility or liability with respect to independent research selected by the Independent Consultant under the Global Research Settlement. Clients assume full responsibility for any trading decisions they make based upon such independent research ratings or reports.

### Prices and Values

When we believe our pricing information to be reliable, we cannot guarantee its accuracy.

### Cost Data/Realized Capital Gains & Losses:

Cost data and Realized Capital Gains/Losses are provided for informational purposes only. Please review for accuracy. Merrill Lynch is not responsible for omitted or restated data. Please consult your tax advisor to determine the tax consequences of your securities transactions. Your statement is not an official accounting of realized gains/losses, and Merrill Lynch does not report gains/losses to the I.R.S. Please refer to your records,

trade confirmations, and the Consolidated Tax Reporting Statement (Form 1099).

**Managed Trust Units:** Information is based on data from the Merrill Lynch Trust Company or its agent. Neither the Trust nor its units are held in your Merrill Lynch account and are not subject to SIPC.

**Fixed-Income Securities:** Values on your statement generally are based on estimates, which are obtained from various sources. The values often vary from prices achieved in actual transactions, especially for thinly traded securities, and are not firm bids or offers. The values assume no unusual market conditions and are generally for transactions of $1 million or more, which often have more favorable pricing than transactions in smaller amounts. Accordingly, you may pay more than the values if you purchase securities, or receive less if you sell securities.

**Insurance Policies:** Information is based on data from the insurer that issued the policy. Merrill Lynch is not responsible for the calculation of policy values. Policies are generally not held in your Merrill Lynch account. If Merrill Lynch is custodian or trustee holds a policy that is a security, SIPC protection and excess-SIPC protection applies.

**Est. Annual Yield/%:** An annualized yield based on rates for the statement month. Current yields may be higher or lower.

### Symbols and Abbreviations

| Symbol | | Meaning |
|---|---|---|
| ■ | N/A | Value and/or cost data not available. |
| • | N/C | Not-Calculated. |
| .. | N/O | Non-negotiable securities. |
| .:OCC | N/O CUST | Held registered in your name. |
| | | Non-negotiable Custodian Registration. |
| | | Interest reported to the IRS. |
| | | Gross Proceeds reported to the IRS. |
| | | Dividends reported to the IRS. |
| | | Transactions reported to the IRS. |
| | | Options Clearing Corporation. |
| # | | Transaction you requested required same-day payment - Merrill Lynch retained last day's dividend to offset cost of advancing payment on your behalf. |
| RD | | Bonds are changeable from coupon to registered and vice versa without charge. |
| RG | | Bonds registered for both principal and interest. |
| ↑↓ | | Indicates that our global securities research division has upgraded(↑) or downgraded(↓) its fundamental opinion on a security. |